IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TODD AARON HOWARD HAMILTON SUTTON, JR.,<br><br>Defendant. | No. 24-CR-3037-LTS-KEM<br><br>**REPORT AND RECOMMENDATION** |

_____

Defendant Todd Aaron Howard Hamilton Sutton, Jr., challenges the reasonableness of a strip search after he was arrested for driving with a suspended license and taken to jail. Doc. 25. Sutton argues that because he planned to bond out before being placed into the jail's general population, the search was unnecessary and violated his Fourth Amendment rights. The Government filed a resistance (Doc. 34), and Sutton filed a reply (Doc. 35).

I held a hearing on the motion to suppress on December 11, 2024. Doc. 40. At the hearing, the following witnesses testified:

- Cerro Gordo County Jail Administrator Andrew Steenblock;
- Cerro Gordo County Jail Corrections Sergeant Brad LeClere;
- Cerro Gordo County Jail Corrections Sergeant Robert Beaver; and
- Cerro Gordo County Sheriff's Deputy Noah Friese.

I also admitted the following exhibits into evidence:

- Defendant Exhibit A (Doc. 26-1) – Deputy Friese's police report;
- Defendant Exhibit B (Doc. 26-2) – Sergeant Beaver's jail incident report;
- Defendant Exhibit C (Doc. 26-3) – Sergeant LeClere's jail incident report;
- Defendant Exhibit D (Doc. 26-4) – inventory sheet;
- Defendant Exhibit E (Doc. 26-5) – video from Deputy Friese's body camera;
- Government Exhibits 1A through 1C (Docs. 32-1 to 32-3) – state court materials;
- Government Exhibit 2A (Doc. 33-1) – cell transfer log;

- Government Exhibit 2B (Doc. 33-2) – jail release report;
- Government Exhibits 3A to 3D (Docs. 39-1 to 39-4) – Cerro Gordo County Jail policies;
- Government Exhibit 3E (Doc. 39-5) – Iowa Supreme Court uniform bond schedule; and
- Government Exhibit 4 (Doc. 39-6) – Sergeant LeClere's January 2024 jail incident report.

I recommend **denying** the motion to suppress (Doc. 25).

## I. BACKGROUND[1]

In the early morning hours of July 27, 2024, Deputy Friese conducted a traffic stop and arrested Sutton for driving while barred, an aggravated misdemeanor under Iowa law.[2] *See* Doc. 26-1. Deputy Friese took Sutton to the Cerro Gordo County Jail for booking.

At the jail, Deputy Friese and Sutton entered the booking room, a small room with several computers and a phone. *See* Def. Ex. E. Deputy Friese removed handcuffs from Sutton and had him count his cash for inventory purposes. *Id.* Sutton had $433 in cash. *Id.* Deputy Friese gave Sutton his cell phone and said he could make any phone calls he wanted while Deputy Friese completed his intake paperwork. *Id.* Sutton said he would make calls once he knew his bond. *Id.* Deputy Friese explained that the bond for an aggravated misdemeanor was $2,000 and showed Sutton the uniform bond schedule that was posted in the booking room. *Id.*; *see also* Doc. 39-5. Deputy Friese said that a bail bondsman would probably want 15 to 20%, so $300 to $400; he also advised that if Sutton waited until he saw a judge (before noon), he could avoid paying a bail bondsman. Def. Ex. E. Sutton said he would rather pay $400 and get out of jail now. *Id.* Deputy Friese told Sutton he could start calling people and pointed out the posted list of bail bondsmen telephone numbers. Sutton said he did not want to go through a bail bondsman,

---

[1] The facts in the background section are taken from the testimony at the suppression hearing unless otherwise noted.

[2] **Iowa Code § 321.561**.

2

Case 3:24-cr-03037-LTS-KEM    Document 41    Filed 12/20/24    Page 2 of 10

but Deputy Friese explained he would have to use a bail bondsman unless he had $2,000 in cash (Sutton said he did not). *Id.* Deputy Friese indicated that while it would ultimately be up to a bail bondsman, Sutton likely had enough cash to pay a bail bondsman and bond out of jail right then. *Id.* Deputy Friese allowed Sutton to use his own cell phone to make phone calls. Sutton tried dialing numbers, but Deputy Friese was uncertain if he reached anyone. Deputy Friese remained with Sutton in the booking room for about twenty minutes after his body camera video stopped recording.

After the booking room, the arresting officer turns the arrestee over to jail staff. The arrestee is kept in the intake section of the jail until their initial appearance with a judge (after which they are moved to one of the six pods in the general population section of the jail). The intake section consists of the intake room, a room for changing clothes, four holding cells, a padded cell, and two dorms. Each dorm holds ten people and consists of a large room with four double bunk beds, a table, a television, a phone, and bathroom facilities. Whether an inmate will be kept in the dorm or a separate holding cell depends on their behavior. Per jail policy, anyone charged with at least a serious misdemeanor is taken to the changing room and required to change out of their street clothes and into a jail uniform. *See* Doc. 39-3. They are also subject to a strip search, consisting of a visual inspection of their naked person by two correctional officers of the same sex as the arrestee. *Id.* Per policy, a correctional officer may ask the arrestee to move body parts around (e.g., to spread their buttocks), but no cavity searches are conducted unless there is probable cause. *Id.* Jail staff testified at the hearing that they conduct a strip search even if it is likely that an inmate will bond out or be released by the magistrate judge at the initial appearance, because there are too many unknowns—for example, an inmate might not be able to reach a bail bondsman or to find someone to cosign the bond. Jail staff testified that arrestees often have difficulty reaching a bail bondsman in the middle of the night (Sutton went through the booking process around 4:00 a.m.) and that even if they reach one, it may take a bail bondsman hours to arrive. They also indicated that if an arrestee is designated to go to the general population section

3

after their initial appearance (they are not being released by the judge or on bond), jail staff conduct another strip search and have the arrestee change into a different jail uniform.

Since Sutton was charged with at least a serious misdemeanor, jail policy required that he be strip searched before being placed in the intake dorm (which already contained two inmates at the time of Sutton's arrest). Sergeant Beaver was working intake. Sergeant LeClere also came to intake when he learned of Sutton's arrest, reminding Sergeant Beaver of a past run-in with Sutton: in January 2024, Sutton had been arrested for driving while barred and possessing drug paraphernalia and smelled of marijuana, and during a strip search at the jail, Sergeant LeClere found a plastic-wrapped baggie of drugs tucked under Sutton's genitals. Sergeant Beaver and Sergeant LeClere took Sutton to the changing room, requiring him to take his clothes off for them to inspect his naked person. They asked him to move his genitals so they could inspect underneath, and when he complied, they observed a plastic baggie of drugs tucked between his genitals and buttocks. Sutton removed the baggie and handed it to the correctional officers. Sutton was placed into the dorm with two other inmates. He was ultimately charged with a drug offense based on the strip search and remained in custody until he was charged federally in this case.

## II. DISCUSSION

The Fourth Amendment protects against unreasonable searches and seizures. To determine whether intrusions on an inmate's privacy are reasonable, "[t]he need for a particular search must be balanced against the resulting invasion of personal rights."[3]

In *Florence*, the Supreme Court rejected the argument that a person "arrested for a minor offense could not be" subjected to a strip search "as part of the intake process"

---

[3] ***Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington***, 566 U.S. 318, 327 (2012).

without particularized reasonable suspicion.[4] In that case, the detainee had been arrested on an outstanding warrant for failing to appear at a hearing and pay fines.[5] He had been held at one facility for six days, then transferred to a larger facility, where he was strip searched upon his arrival, then released the next day.[6] The Court noted that at the larger facility, the detainee "shared a cell with at least one other person and interacted with other inmates."[7] The Court concluded the following test controls: courts "must defer to the judgment of correctional officers" on the necessity of strip-search policies "unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security."[8] The Court held the *Florence* detainee could not meet this standard, based on the need for jail staff to ensure that contraband such as drugs and weapons stayed out of the jail, as well as "evidence that the seriousness of an offense is a poor predictor of who has contraband and that it would be difficult in practice . . . . to classify inmates by their current and prior offenses before the intake search."[9] The Court thus concluded that "the Constitution must not prevent [jail staff] from conducting the same search on any suspected offender who will be admitted to the general population in their facilities."[10] The Court specifically noted it did not address the reasonableness of a strip search for "a detainee [who] will be held without assignment to the general jail population and without substantial contact with other detainees," or for "an arrestee whose detention has not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general

---

[4] *Id.* at 324.

[5] *Id.* at 323.

[6] *Id.* at 323-34.

[7] *Id.* at 323.

[8] *Id.* at 322-23; *see also id.* at 328, 330.

[9] *Id.* at 330-336.

[10] *Id.* at 338.

5

population."[11]  Justice Roberts and Justice Alito (who were necessary for the majority), emphasized in concurring opinions that the Court left "open the possibility of exceptions" to the constitutionality of a general strip-search rule[12] and "that the Court does not hold that it is *always* reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population."[13]

Sutton argues that the strip search here falls under the exception left open in *Florence*. Sutton argues that if the search had not occurred (and drugs not been found), he never would have been placed into the jail's general population—he would have bonded out beforehand. But although Sutton expressed interest in bonding out in the booking room, and he had sufficient cash to pay a bail bondsman 15% to 20% of his bond, it is unclear that he actually contacted a bail bondsman when given the opportunity. Even if he reached a bail bondsman, there is no information about how long it would have taken for the bail bondsman to arrive (witnesses at the hearing estimated it may have taken a bail bondsman one hour to arrive at the jail, but more likely two to three hours or longer, especially considering Sutton arrived at the jail around 4:00 a.m). Sutton admitted he did not have the $2,000 required to bond out without a bail bondsman. Thus, it does not appear that Sutton could have bonded out immediately and avoided mixing with other inmates in the intake section of the jail. On the other hand, Deputy Friese's statements to Sutton in the booking room suggest that Deputy Friese believed Sutton would be released by the magistrate after his initial appearance, whether or not he had the money for bond.[14]  Thus, the issue is whether a policy allowing the strip search of all

---

[11] *Id.* at 338-39.

[12] *Id.* at 340 (Roberts, J., concurring) (recognizing possibility for exceptions but noting "[t]he Court makes a persuasive case for the general applicability of the rule it announces").

[13] *Id.* at 341 (Alito, J., concurring).

[14] The Government notes Sutton never bonded out and remained in jail for more than a month. I do not find the fact that Sutton remained detained after being charged with a more serious drug

6

arrestees (charged with at least a serious misdemeanor) is an exaggerated response to ensure jail security, when the arrestee will have contact with others awaiting their initial appearance, but not with detainees in the general population.

I find Judge Bennett's reasoning addressing an identical jail policy persuasive:

> I reject the plaintiffs' argument that detainees who have been arrested only on serious misdemeanor or higher offenses and who will not be put into "general population" *per se* should be exempt from a strip search unless they give officers a particular reason to suspect them of hiding contraband. As the Court concluded in *Florence,* it was reasonable for jail officials to conclude that such an exemption would be "unworkable," that "the seriousness of the offense is a poor predictor of who has contraband," and "that it would be difficult in practice to determine whether individual detainees fall within the proposed exemption."
>
> What makes this so here is . . . that even detainees initially held alone in separate temporary holding cells, away from the jail's "general population," (1) may nevertheless be "doubled up" in light of the limited number of temporary holding cells—which undisputedly occurred [with one plaintiff here]—for example, because of the varying volume of arrests and the limited number of temporary holding cells, and (2) may be shackled with other detainees for transportation to court—which undisputedly occurred [with two other plaintiffs here]—even before the expiration of their twenty-four hour exclusion from "general population." These circumstances are reasonably likely to involve the "substantial" contact with other detainees that concerned the Court in *Florence*.
>
> Although the plaintiffs complain that the County is relying only on "potential" contact with other detainees, it is also reasonable to conclude that it is "unworkable," to use a "wait and see" approach to see if detainees actually have contact with others before strip searching them. Such a "wait and see" approach would require jail officials to strip search detainees only when detainees actually had to be "doubled up" or only when detainees actually had to be shackled with others for transportation to court. Thus, such a "wait and see" procedure would impose the extra burden of conducting strip searches of detainees "doubled up" at precisely the time when the influx of arrestees would already be complicating jail intake procedures, and the strip search of detainees before shackling them together would complicate procedures at precisely the time when several detainees

---

offense shows that he necessarily would have remained detained on his driving-while-barred offense if the search revealing drugs had not occurred.

7

Case 3:24-cr-03037-LTS-KEM   Document 41   Filed 12/20/24   Page 7 of 10

would have to be managed for transportation to court. It also would not prevent detainees from secreting contraband in temporary holding cells during the time that they were alone in those cells. Finally, such a "wait and see" procedure would offer considerably less safety to jail officers, who might have numerous contacts with a detainee who has never been strip searched and, consequently, might be hiding a weapon or something that could be used as a weapon, or who could expose them to infectious disease, and it might require them to intervene in an altercation between detainees not recognized as members of rival gangs. Where there is a realistic potential that detainees will have substantial contact with other detainees, even if they are not put into the jail's "general population" during the first twenty-four hours of detention, requiring reasonable suspicion before searching all detainees at the County Jail arrested on serious misdemeanor charges or higher "would limit the intrusion on the privacy of some detainees but at the risk of increased danger to everyone in the facility, including the less serious offenders themselves." The fact that all three of the plaintiffs had contact with other detainees, either in their holding cells or when they were transported to court, demonstrates that the potential for such contact here was realistic. Moreover, it is reasonable to assume that not all of the detainees shackled together for their initial court appearance will be released—most likely because some of them will be unable to post bond immediately. Therefore, some of them may be returned to the jail and placed in "general population."[15]

Here, although Sutton was not placed directly into the general population section, he was housed in a dorm with two other inmates awaiting their initial appearance. This is not a case in which Sutton was placed in a holding cell or otherwise segregated from other

---

[15] ***Rattray v. Woodbury Cnty., Iowa***, 908 F. Supp. 2d 976, 999–1000 (N.D. Iowa 2012) (citations omitted) (quoting *Florence*, 566 U.S. at 334, 338); *see also* ***Mabry v. Lee Cnty.***, 849 F.3d 232, 233, 238-39 (5th Cir. 2017) (affirming grant of summary judgment to jail officials on Fourth Amendment claim brought by a middle school student arrested after a fight and "subjected to a strip and cavity search" "[a]s part of standard intake procedures" at the juvenile detention center, when student was released from the center that same evening; the court held the student "failed to enter evidence into the record below making a substantial showing that the Center's search policy is an exaggerated or otherwise irrational response to the problem of Center security," despite defendant's inability at oral argument to "point to even one instance in which contraband was found via the strip and cavity search that could not have been found through use of the metal detecting wand and pat-down," nor provided an explanation for placing all "pretrial detainees into its general population as a default matter").

inmates.¹⁶  I do not find that Sutton has shown the strip-search policy was an unjustified response to jail security in this instance.

In the alternative, the Government argues that jail staff had probable cause that Sutton had hidden drugs on his person, simply because he had previously hidden drugs under his genital area about six months prior.  Defendant distinguishes the prior occasion in January 2024, however, because Sutton smelled of marijuana; in July 2024, officers had no reason to suspect Sutton of possessing drugs, other than his previous possession.  Although this provides some particularized suspicion for a strip search, I doubt that it rises to the level of reasonable suspicion, and certainly not probable cause.  Because I find the generalized strip-search policy reasonable, I decline to address whether jail staff had the particularized suspicion necessary to search Sutton.

### III.   CONCLUSION

The court recommends **DENYING** Defendant Sutton's motion to suppress (Doc. 25).

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections.  A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections.¹⁷  Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the

---

¹⁶ *Cf.* **Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs**, 962 F.3d 1204, 1215, 1236-38 (10th Cir. 2020) (holding unreasonable strip search pursuant to policy requiring strip search of all detainees, regardless of charge or housing placement, when detainee was segregated from other inmates due to his status as a former law enforcement officer).

¹⁷ **LCrR 59**.

objections.[18]  Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[19]

**DATED** December 20, 2024.

*(signature)*
Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

---

[18] *See* **Fed. R. Crim. P. 59**.

[19] *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).