IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TODD AARON HOWARD HAMILTON SUTTON, JR.,<br><br>Defendant. | No. CR24-3037-LTS-KEM<br><br>**ORDER ON REPORT AND RECOMMENDATION** |

## *I.  INTRODUCTION*

This matter is before me on a Report and Recommendation (R&R) (Doc. 41) in which the Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge, recommends that I deny a motion (Doc. 25) to suppress evidence filed by defendant Todd Aaron Howard Hamilton Sutton, Jr. Sutton has filed objections (Doc. 45) and the Government has filed a response (Doc. 46) and amended response (Doc. 47).

## *II.  BACKGROUND*

Sutton is charged in an indictment (Doc. 2) with one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). His motion (Doc. 25) to suppress seeks the exclusion of methamphetamine and drug paraphernalia obtained via strip search during his booking at the Cerro Gordo County Jail on July 27, 2024. The Government resists. Doc. 34. Judge Mahoney held an evidentiary hearing on December 11, 2024. Doc. 40. The Government called four witnesses and Judge Mahoney admitted four sets of Government exhibits and five defense exhibits. *Id.*

Judge Mahoney issued her R&R (Doc. 41) on December 20, 2024. Sutton filed his objections (Doc. 45) on January 3, 2025. The Government filed its amended response

(Doc. 47) on January 13, 2025. This case is currently on the court's rotating trial docket for February 24, 2025.

## III. STANDARD OF REVIEW

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude

further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

### IV.    DISCUSSION[1]

Sutton challenges the reasonableness of a strip search that was performed pursuant to a jail policy before he was placed into an intake dorm with two other inmates awaiting their initial appearances. He argues that because he told officers he had the money to post bond, and because the jail had not designated him to general population, he should not have been subjected to a strip search.

Judge Mahoney noted the Supreme Court has stated courts "must defer to the judgment of correctional officers" on the necessity of strip search policies "unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." Doc. 41 at 4 (quoting *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 327 (2012)). She discussed *Florence*, in which the Court held that a strip search was reasonable because even though the detainee had been arrested for a minor offense, he was going to be admitted to the general jail population. *Id.* at 4-5. Judge Mahoney observed that Justice Alito (whose vote was necessary for the majority), emphasized in his concurring opinion that "the Court does not hold it is *always* reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population." *Id.* at 6 (quoting *Florence*, at 341 (Alito, J., concurring). Judge Mahoney characterized the issue in this case as "whether a policy allowing the strip search of all arrestees (charged with at least a serious misdemeanor) is an exaggerated response to ensure jail security, when the arrestee will

---

[1] Judge Mahoney provided a thorough background of the circumstances leading up to the strip search in this case that I will not repeat herein. *See* Doc. 41 at 2-4.

3

have contact with others awaiting their initial appearance, but not with detainees in the general population." *Id.* at 6-7.

Judge Mahoney relied on the reasoning in *Rattray v. Woodbury Cnty., Iowa*, 908 F. Supp. 2d 976, 999-1000 (N.D. Iowa 2012), which addressed an identical jail policy. In that case, this court concluded reasonable suspicion was not required if there was a realistic potential that detainees would have substantial contact with other detainees, even if they were not put into the jail's general population during the first 24 hours of detention. *Id.* at 8 (quoting *Rattray*, 908 F. Supp. 2d at 999-1000). The *Rattray* court reasoned that even if detainees were held separate from the general population, they could be held with other inmates based on the varying volume of arrests and limited temporary holding cells and they could also be transported with other detainees to court. *Id.* at 7 (quoting *Rattray*, 908 F. Supp. 2d at 999-1000). The court also found it unworkable for a jail to use a "wait and see" approach regarding if detainees would have substantial contact with other detainees before deciding to strip search them, as this would impose an extra burden on jail staff at a time when the influx of arrestees may already be complicating jail intake and transportation procedures. *Id.* (quoting *Rattray*, 908 F. Supp. 2d at 999-1000). Nor would it prevent detainees from secreting contraband when they were alone in temporary holding cells and it would offer less safety to jail officers. *Id.* at 7-8 (quoting *Rattray*, 908 F. Supp. 2d at 999-1000).

Because Sutton was housed with two other detainees awaiting their initial appearances, Judge Mahoney concluded he had not shown the strip search policy was an unjustified response to jail security in this instance. *Id.* at 8-9. Judge Mahoney declined to consider the Government's alternative argument that jail staff had the particularized suspicion necessary to search Sutton. *Id.* at 9. In his objections to the R&R, Sutton emphasizes that *Florence* addressed "whether the Fourth Amendment requires correctional officials to exempt some detainees *who will be admitted to a jail's general population* from the searches here at issue." *Florence*, 566 U.S. at 325-26 (emphasis added by Sutton). He contends that under *Florence*, a jail must first decide whether a

4

detainee will be admitted to the jail's general population before conducting any strip search. Doc. 45 at 4 (citing *Hinkle v. Beckham Cnty. Bd. of Cnty. Commissioners*, 962 F.3d 1204, 1237 (10th Cir. 2020)).[2] He argues *Florence* does not support a wide-ranging jail policy of strip searching all individuals without suspicion, excepting only those with the most minor offenses, regardless of their commitment to general population, the availability of alternative holding facilities and prior commitment by a magistrate. Doc. 45 at 5. He contends the Cerro Gordo County Jail policy is unreasonable under the Fourth Amendment because it requires searches of individuals prior to any determination that they will enter the general population.

Sutton is correct this search falls outside the scope of the search approved in *Florence* because *Florence* did not "rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees." *Florence*, 566 U.S. at 38-29. The *Florence* Court also acknowledged:

> The circumstances before the Court . . . do not present the opportunity to consider a narrow exception of the sort Justice Alito describes . . . which might restrict whether an arrestee whose detention has not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population, may be subjected to the types of searches at issue here.

---

[2] In *Hinkle*, the detainee (a former law enforcement officer) was subjected to a body cavity search, which required Hinkle to lift his scrotum and spread his buttocks, squat and cough with an officer inspecting Hinkle's anal cavity from a couple feet away. The officer also manually searched through Hinkle's beard. *See Hinkle*, 962 F.3d at 1214-15. This search was done pursuant to the county's policy of strip searching all detainees immediately upon arrival at the jail before determining where they would be housed. Hinkle was transported to a separate facility to avoid placing him in the jail's general population due to his status as a former law enforcement officer. The Tenth Circuit found the body cavity search was unlawful because *Florence* did not authorize the jail's policy and the search was otherwise unsupported by probable cause. *Hinkle*, 962 F.3d at 1242.

*Id.* at 339.[3]  Sutton argues that because the Cerro Gordo County Jail's policy requires searches of individuals prior to any determination that they will enter the general population, it is unreasonable under the Fourth Amendment.

Judge Mahoney considered that distinction by relying on the reasoning in *Rattray*, which also considered the distinction.  *See Rattray*, 908 F. Supp. 2d at 999-1000 ("I reject the plaintiffs' argument that detainees who have been arrested only on serious misdemeanor or higher offenses and who will not be put into "general population" *per se* should be exempt from a strip search unless they give officers a particular reason to suspect them of hiding contraband.").  In *Rattray*, the court explained that such an exemption would be "unworkable," that the seriousness of the offense was a poor predictor of who has contraband and it would be difficult in practice to determine whether individual detainees fell within the proposed exemption – all of which were reasons the *Florence* Court relied on to find the search procedure reasonable in that case.  *Florence*, 566 U.S. at 334.  The court in *Rattray* also explained that even if detainees were initially held in separate temporary holding cells away from the jail's general population, they could be doubled up in the event of an increase in arrests and they could be transported with other detainees – both of which would likely involve "substantial" contact with other detainees that concerned the Court in *Florence*.  *Rattray*, 908 F. Supp. 2d at 999-1000.  Judge Mahoney found this reasoning persuasive and noted that although Sutton was not placed directly into the general population section of the jail, he was housed in a dorm with two other inmates awaiting their initial appearance.  Doc. 41 at 8.  She distinguished this from the situation in *Hinkle* in which the detainee was segregated from other inmates due to his status as a former law enforcement officer.  *Id.* at 9, n. 16.

---

[3] Justice Alito noted the Court's holding was limited to "arrestees who are committed to the general population of a jail." *Id.* at 340 (Alito, J., concurring). He added: "It is important to note . . that the Court does not hold that it is *always* reasonable to conduct a strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population." *Id.* at 341.

6

Based on my de novo review, I agree with Judge Mahoney and the reasoning this court set forth in *Rattray*. As the court in *Rattray* noted, *Florence* overruled those decisions holding that a strip search *always* requires reasonable suspicion. *Rattray*, 908 F. Supp. 2d at 992. *Florence* concluded that strip searches in which the detainee would be admitted to the general population did not require reasonable suspicion but did not address other circumstances in which a strip search without reasonable suspicion could still be considered reasonable. Those circumstances are still undefined. Nonetheless, *Florence* provides some guidance as to when a strip search may be reasonable absent reasonable suspicion, citing relevant factors such as safety concerns present at a jail or detention center and the practicalities that correctional officers face during the intake process. *See Florence*, 566 U.S. at 326. Like other areas of Fourth Amendment jurisprudence, *Florence* suggests there must be an appropriate balance between protecting one's privacy and these factors that necessitate the search. *Id.* at 327 ("The need for a particular search must be balanced against the resulting invasion of personal rights."); *see also Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (instructing that when balancing the need for a particular search against the invasion of personal rights, courts must consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."). I find that the strip search performed here pursuant to the jail's policy strikes the appropriate balance under the circumstances presented.

The Government presented evidence that every inmate charged with a serious misdemeanor or above is subjected to a strip search pursuant to the Cerro Gordo County Jail's policy. Doc. 42 at 24-25. At the time of Sutton's intake, there were two individuals already housed in the area where Sutton would be housed. *Id.* at 13. All three were waiting for their initial appearances. *Id.* Jail Administrator Andrew Steenblock explained that even if a person has contacted a bondsman, they are still strip searched and put into a dorm because there are too many factors at play regarding if and when that person is actually able to post bond. *Id.* at 12, 29-30. While Sutton was not designated to general

7

population prior to the strip search performed here, he was housed with two other inmates awaiting their initial appearances. Thus, he was going to have substantial contact with other detainees, presenting safety concerns. The strip search pursuant to the jail's policy was reasonable.

*Florence* does not demand this result, nor does it preclude it. Had Sutton been designated to general population prior to the strip search, the search would be deemed reasonable under *Florence*. But *Florence* did not determine, beyond those circumstances, when other strip searches and policies may be reasonable. This is why *Hinkle* is not persuasive. *Hinkle* involved a more invasive body cavity strip search of a detainee prior to the intake process who was then segregated from general population due to his status as a former law enforcement officer. *Hinkle* recognized that *Florence* did not authorize the search because the detainee had not first been designated to the jail's general population. It then went on to analyze the reasonableness of the search and concluded probable cause was required. *See Hinkle*, 962 F.3d at 1239 ("for detainees like Hinkle who will not be housed in the jail's general population, the County needs far more to justify a body-cavity strip search – probable cause that detainee is secreting evidence of a crime.").

I agree with *Hinkle* to the extent that *Florence* does not authorize the specific type of search here. However, I disagree that probable cause or reasonable suspicion is necessarily required under these circumstances. *Hinkle* offered little explanation for its conclusion aside from the nature of the search – a body-cavity strip search – and the fact that Hinkle would decidedly not be housed in the jail's general population. Both of these factual circumstances are distinguishable from the facts in this case, as the search was not as invasive and Sutton was going to be housed with other detainees. As noted above, *Florence* did not conclude that *only* those searches when the inmate would be housed with the general population would be deemed reasonable in the absence of reasonable suspicion. Rather, it emphasized that its holding was limited to the facts of that case.

Because Sutton had been charged with at least a serious misdemeanor and was going to be housed with other detainees for some period of time before either being released or being designated to the general population, it was reasonable for the jail to conduct a strip search pursuant to its policy to ensure jail security.

## V. CONCLUSION

For the reasons set forth herein:

1. Sutton's objections (Doc. 45) to the Report and Recommendation (Doc. 41) are **overruled**.

2. I **accept** the Report and Recommendation (Doc. 41) without modification.

3. Pursuant to the Report and Recommendation, Sutton's motion (Doc. 25) to suppress evidence is **denied**.

**IT IS SO ORDERED** this 22nd day of January, 2025.

_____
Leonard T. Strand
United States District Judge